## BELLATTY v. BARRETT MFG. CO.

### SAME v. C. J. MIERS & SON.

(District Court, D. Massachusetts. November 16, 1911.)

### Nos. 402, 405.

**1.** MASTER AND SERVANT (§ 316*)—THE RELATION—SERVANT OF INDEPENDENT CONTRACTOR.

A shipper of cargo on a schooner of which libelant was master employed a company engaged in the general business of teaming and trucking to haul barrels of tar to the schooner for loading. The company sent a regular employé with a team and cart, who was directed by the shipper where to go for the tar and where to take it, but was given no further instructions. Through his negligence in unloading a barrel from his cart, it rolled off the wharf onto the deck of the schooner, some distance below, and struck and injured libelant. *Held*, that the driver was not the servant of the shipper, but of the teaming company, which was an independent contractor and liable for his negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1242, 1243; Dec. Dig. § 316.*]

**2.** DAMAGES (§ 132*)—PERSONAL INJURIES—AMOUNT OF COMPENSATION.

An award of $3,100 damages made to libelant, who was 51 years old, in good health, and able to do hard work, earning at least $900 per year by sailing a schooner on shares, for an injury which kept him in a hospital 3 weeks and left him permanently lame and unable to do his customary work and made it necessary to give up his vessel.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385; Dec. Dig. § 132.*]

In Admiralty. Suits by Adelbert L. Bellatty against the Barrett Manufacturing Company and C. J. Miers & Son to recover for a personal injury. Decree dismissing the libel against the Barrett Manufacturing Company, and for libelant against C. J. Miers & Son.

Coggan & Coggan and George L. Dillaway, for libelant.

Walter I. Badger and Boyden, Palfrey, Bradlee & Twombly, for Barrett Mfg. Co.

M. O. Garner, for C. J. Miers & Son.

HALE, District Judge. These libels are brought to recover damages alleged to have been sustained by reason of the negligence of the driver of a team belonging to C. J. Miers & Son, in loading a barrel of tar which rolled off the wharf upon the schooner's deck, striking and injuring the libelant. Capt. Bellatty, the libelant, was the master in charge of the schooner Nellie Grant, lying at the Gas House Wharf in the port of Boston, below Charlestown Bridge, taking on a general cargo. The schooner was partly loaded with cement in the hold, and on April 10, 1911, was taking on a number of barrels of tar which were being shipped upon her by the Barrett Manufacturing Company. The schooner was a two-masted vessel of about 139 tons, lying with her port side to the wharf and with her deck some 10 or 12 feet below the caplog of the wharf. On board the schooner

there were three men, the master, the mate, and a seaman. Another seaman, one Thornton E. Cook, was on the wharf, engaged in hooking barrels on to the tackle to be lowered. All the seamen were employés of the captain, who sailed the vessel on shares, and was owner pro hac vice. The libelant was injured by a barrel of tar weighing about 500 to 600 pounds which rolled off the wharf, through the forerigging, striking him upon the head and knocking him down, causing numerous injuries. At the time of the accident, the libelant, with two seamen, was hoisting up the throat of the gaff in order to throw the hoisting tackle further aft. He was in a stooping position. The other two men were standing up, holding the slack of the halliards. The man on the wharf was standing near the edge, with the barrel hooked on, ready to hoist on board, waiting for the tackle to be made ready. At this time Fitz, a teamster in the general employment of C. J. Miers & Son, teamsters, was unloading barrels of tar from a cart backed up about 30 feet from the edge of the wharf. This unloading was done by means of a skid or plank, six or eight feet long, running from the bottom of the cart to the ground in the direction of the schooner. The bottom of the cart was about two feet and a half high above the ground. Down this plank or skid it was customary to slide the barrels endwise, then turn them around, and roll them out of the way. In this way, the teamster had unloaded some four or five barrels safely. The next barrel he started and rolled down the skid. It rolled rapidly across the wharf, over the edge, and through the forerigging of the schooner upon the libelant. As it was rolling, the teamster shouted, "Look out!" Cook, the man at the edge of the wharf, glanced around and saw the barrel just at the edge of the wharf. He also shouted, "Look out!" The two men below who were standing up sprang away. The barrel broke through the ratlines, struck and bent the iron sheerpole, and bounded on, striking the captain as he was stooping down.

The surface of the wharf was of smooth, hard earth, with no projection to stop the barrel from rolling, except a plank about two inches thick at the edge. The slope was gradual from the cart toward the water. Only one man, Fitz, was on the team unloading. There was no one at the foot of the skid to receive the barrels as they came down. Cook, one of the schooner's crew, was on the wharf, and had helped in receiving the first two barrels. He had then taken those barrels and proceeded to hook them on and lower them to the vessel. He was standing back to the team, 25 feet from it, at the time of the injury.

1. From all the testimony, the court has no hesitation in concluding that negligence has been shown on the part of Fitz, the driver of the team, who undertook to unload the barrels of tar. Having heard all the testimony, and carefully examined the record, I am clearly of the opinion that the teamster was negligent in rolling the barrel down, or allowing it to roll down, instead of sliding it off upon the skid as he had been accustomed to do; and as was the usual way of unloading. The teamster was in charge of the cart, with a load of heavy barrels, backed up within 30 feet of the edge of the wharf, with a smooth

surface, presenting some declivity towards the water. He was unloading barrels from a cart two feet and a half high above the ground, and down over a skid which, from its length, and from the height of the cart, must have been at such a pitch as to give the barrel a great momentum as it rolled. These facts were all before the teamster. If he had taken the care that a reasonably prudent man should take under the circumstances, in handling the barrel while unloading it, the injury would not have happened. It appears that, although the barrels were heavy, he had been accustomed to unload these barrels, and had always done it before, so far as the case shows, with safety. I can have no doubt that the injury happened through the negligence of the driver, Fitz.

[1] 2. Was the driver, Fitz, a servant of the shippers, the Barrett Manufacturing Company, or of C. J. Miers & Son, the teamsters? The case shows that Fitz was in the general employment of C. J. Miers & Son, a corporation engaged in the general business of teaming and trucking, and that they paid him by the week. It appears that, on the day of the injury, they sent Fitz to the Barrett Manufacturing Company, the shippers, with a team. This was done at the request of the shippers, whose agent, Chapman, directed Fitz where to go for his load, and where to take it, but instructed him no further. He did not tell Fitz what to do with the barrels, or how to unload them. He did not undertake to control him, or to exercise any dominion over him. All that Fitz did was to receive from the shippers the barrels to be carried by him, with instructions where to take them. The load of barrels hauled by Fitz was, then, entirely out of the control of the Barrett Manufacturing Company; that company did not attempt in any way to exercise authority over it, or over its driver. C. J. Miers & Son, the teamsters, remained in full control of the driver, who was engaged in his general business under his general employment. The same rule must apply to the handling of the goods at the wharf as would have applied if, through the carelessness of the driver, a barrel had fallen off the load on the route and injured some one. The driver unloaded as he thought proper. The Barrett Manufacturing Company did not undertake to direct him in unloading. The testimony leads me to the conclusion that he was still the servant of Miers & Son, and under the control of that corporation, just as much in unloading the load upon the wharf as he was while in the actual management of the team. The corporation was engaged in the general business of teaming; and in the conduct of its business it was at work for one of its regular customers and, so far as the case shows, in the usual manner. The plain question before me is: In whose control was the teamster at the time of his negligent act? The courts have repeatedly held the test of liability to be the right and power to control the agent in the performance of the act or omission, at the time of its performance or neglect. Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480, and 152 Fed. 166, 81 C. C. A. 399. Applying this strict test to the facts of the case at bar, I am constrained to find that the respondent C. J. Miers & Son must be held liable for the negligence of its

driver, Fitz. I find also that the Barrett Manufacturing Company cannot be held liable.

3. Was the libelant in fault? It is urged by the respondent that the libelant was guilty of contributory negligence. While the case was on trial, I thought it presented a close question upon this point. If it should be found to be any part of the duty of Thornton E. Cook, the seaman upon the wharf, to help unload the barrels of tar from the wagon, then the evidence might tend to show that Cook was not in the exercise of his duty; and his negligence would be the negligence of the libelant, the captain of the schooner, inasmuch as the master was sailing the schooner on shares, and was liable for the acts of the seamen, they being his employés. After a careful examination, the whole evidence convinces me that Cook's duties were to hook the barrels on, and assist in lowering them; that, at the time of the injury, 42 barrels had been unloaded upon the ship; that it was no part of his duty to help unload the wagon; and that he was never instructed by his employer to receive the barrels from the teams, or to guide them on their way down the wharf. The delivery was made, not upon the team, but upon the wharf. The duty of the respondent Miers & Son, and of their agent, did not cease until the goods were landed upon the wharf. Forty-two barrels had already been brought, landed, and lowered in safety. The testimony tends to show that they were all unloaded in the same way, without any assistance from Cook. When the team first arrived, Cook voluntarily helped the teamster to unload two of the barrels. These he took to the edge of the wharf, in order to start his loading. After that he kept on lowering the barrels without paying any attention to their unloading from the cart. After a careful study of the case, I am satisfied that Cook was not guilty of contributory negligence, and that the libelant was not at fault. The duty of exercising due care on the part of the libelant, under the circumstances of the case, did not require him to anticipate the negligence of the teamster. I am satisfied, upon the whole, that there was nothing in the case which called upon the libelant to exercise more care than he did, that he was not in violation of any duty, and should not be held to have been in fault.

[2] 4. What damages should the libelant recover? The case was fully heard before me upon this point as well as upon all others; and counsel requested the court to pass upon the question of damages, without reference to a master. The case shows that by the injury the captain had three ribs broken, two cuts on his head half an inch long, a large abrasion on his upper right arm, a wide bruise and abrasion over his ribs into the left loin, abrasion of his left thigh, and fracture of two of the bones in his right foot. He was taken to the Relief Hospital, where he remained three days; he was then taken to the City Hospital, where he remained until May 1st. It was found there that his left ankle was broken instead of sprained. The wounds in his head were sewed up, the bruises treated, his ribs set, his right foot and left ankle placed in plaster casts. He remained in bed until April 26th, when he was allowed to sit in a chair and was given crutches. On May 1st he was discharged and went to his home in

Ellsworth, Me. He suffered pain in his right foot, was very sleepless, and, for a long time, was obliged to use crutches. The testimony tends to show that before the injury he was in good health, and had never been seriously ill; and that he was able to do extremely hard work. At present he is suffering from deafness, although it is not quite clear that such deafness is of a serious character. He is flat-footed in his right foot, and is lame. He is at present unable to do any hard work. His right arm is weak and helpless, so that he cannot labor with it. His physician testifies that, while it will improve, it will probably never become what it was before. At the time of his injury he was earning at least $900 a year. He is 51 years old. As the result of the injury, he is unable at present to perform any active duties on the vessel, and has been compelled to give up his vessel. Before the injury he did his own loading and discharging; since then he has not been able to do this.

It is unnecessary to state all the evidence upon the question of damages. After a careful consideration of this evidence, I assess the damages at $3,100. A decree may be drawn dismissing the libel against the Barrett Manufacturing Company, with costs for the respondent. A decree may also be drawn for the libelant against the respondent C. J. Miers & Son, assessing damages for the sum of $3,100, with costs for the libelant.